IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Amy M. Gilbert, et al., | Case No. 3:11 CV 2097 |
| Plaintiffs, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| St. Rita's Professional Services, LLC, et al., | |
| Defendants. | |

### INTRODUCTION

Plaintiffs in this wrongful discharge case are three family members formerly employed by Defendants St. Rita's Professional Services and St. Rita's Medical Center, companies owned and operated by Defendant Catholic Healthcare Partners. Plaintiff Haught is the mother of Plaintiff Gilbert; Gilbert is the mother-in-law of Plaintiff Kirby.

Plaintiffs allege Defendants retaliated against them for protected activity in violation of the False Claim Act ("FCA"), 31 U.S.C. § 3730(h), the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615, and state law. Specifically, Plaintiffs contend Defendants' retaliation stemmed from Gilbert's investigation into fraudulent accounting and billing issues connected with Medicare and Medicaid reimbursements, as well as from Kirby's medical leave and subsequent reinstatement.

Pending now before this Court is Defendants' Motion to Dismiss (Doc. 12) Counts I and II of the First Amended Complaint ("Complaint"). According to Defendants, Plaintiffs' FCA claims are untimely, and their FMLA claims are not supported by the law (Doc. 12 at 1–4). Plaintiffs responded and the matter has been fully briefed (Docs. 14 & 15).

**BACKGROUND**

**Plaintiffs' FCA Allegations**

Dr. Todd Hixenbaugh hired Gilbert as a practice manager in February 2000 and Kirby as a medical secretary in November 2008 (Doc. 9 at 5–6). In early 2009, Dr. Hixenbaugh merged his surgical practice with St. Rita's Professional Services, making Gilbert and Kirby employees of Defendants (Doc. 9 at 6). According to Plaintiffs, in September of that year, Dr. Hixenbaugh asked Gilbert to investigate scheduling discrepancies for surgical procedures between St. Rita's Medical Center and the West Central Ohio Surgery and Endoscopy Center ("WCOSEC"), a for-profit surgery center owned by St. Rita's physicians, including Dr. Hixenbaugh (Doc. 9 at 6). Plaintiffs contend the discrepancies were troubling Dr. Hixenbaugh, as well as other doctors with ownership interests in WCOSEC, because they resulted in less surgical bookings for WCOSEC which needed to improve its financial status (Doc. 9 at 6).

After looking into the matter, Gilbert concluded differences in billing and scheduling procedures were the likely cause of the discrepancies (Doc. 9 at 6). Gilbert learned that WCOSEC routinely called patients the day before a scheduled surgery to demand payment for the procedure for any deductible, including the Medicare co-insurance or co-pay. This practice evidently resulted in patients canceling their scheduled surgery with WCOSEC and rescheduling with St. Rita's Medical Center which did not have a similar upfront financial demand. In an attempt to resolve the issue, Gilbert met with Dixie Cotner, Senior Practice Manager for St. Rita's, as well as other administrators, to negotiate a payment and scheduling policy that would resolve the competitive tension between St. Rita's and WCOSEC (Doc. 9 at 7).

A year after her initial investigation, Gilbert noticed the scheduling issues still persisted (Doc. 9 at 8). This time, Gilbert spoke with Amy Reineke, Office Manager of WCOSEC, as well as Cotner (Doc. 9 at 8). In September 2010, other practice managers expressed complaints about WCOSEC scheduling similar to Gilbert's (Doc. 9 at 8). At Cotner's direction, Gilbert followed up with Reineke and, a week later, Cotner disciplined Gilbert. Gilbert was given a document titled "Coaching for Improvement," allegedly because Reineke was offended by Gilbert's call (Doc. 9 at 9).

Throughout 2010, Gilbert noticed discrepancies in the account receivables totals for St. Rita's and, in October 2010 -- one month after being disciplined by Cotner -- Gilbert noticed the accounts were "off" by over $190,000 (Doc. 9 at 9). Especially troubling to Gilbert was that since December 2010, Dr. Hixenbaugh's office collected only about a quarter of the nearly three million dollars it billed that year (Doc. 9 at 9–10). From approximately August 2010 to March 2011, Gilbert met monthly with David Murphy, St. Rita's Executive Director, to discuss her concerns (Doc. 9 at 10). Gilbert informed Murphy that half of Dr. Hixenbaugh's patients were Medicare or Medicaid users and she believed the billing discrepancies were caused by St. Rita's failure to bill for Medicare and Medicaid claims, a violation of Medicare regulations. Believing this failure unlawful, Gilbert continued to investigate (Doc. 9 at 10).

In a February 2011 operations meeting, Murphy announced that "St. Rita's had hit its numbers" (Doc. 9 at 11). At that time, Gilbert noticed the St. Rita's billing report now matched Dr. Hixenbaugh's internal office report -- in other words, the $190,000 billing discrepancy somehow disappeared (Doc. 9 at 11–12).

Concerned that nearly $200,000 of valid claims were written off, Gilbert approached Murphy, who apparently initiated what can only be described as a wild goose chase. Murphy told Gilbert to

3

call Mike Ricker, St. Rita's accountant. When Gilbert called Ricker's office, she was directed to Jen Ebbing, another accountant (Doc. 9 at 12), who advised that she was directed to adjust the $190,000, "no questions asked" and that she knew no more about the issue. She then directed Gilbert to another accountant, Heather Hillard, who commented she was uncomfortable repeating what she was told, and sent Gilbert to Jennifer Munson, yet another accountant with St. Rita's (Doc. 9 at 12–13). Munson told Gilbert she did not believe the billing discrepancy was related to the validity of Medicare or Medicaid claims, although she felt the reasons given for the adjustment did not make sense and were inconsistent with billing, accounting, and financial standards (Doc. 9 at 13). At the end of that work day, Gilbert was fired (Doc. 9 at 13).

According to Gilbert, Defendants terminated her as retaliation for investigating possible false claims submitted to the Center for Medicare Services in violation of the FCA. St. Rita's upheld Gilbert's termination, citing a number of reasons, all of which Gilbert disputes as inaccurate or false. These reasons include: providing false information to her supervisor, dereliction of duties, on-going customer complaints regarding unprofessional behavior and attitude, and improper classification of a part-time employee as full-time (Doc. 9 at 15).

Though neither Kirby nor Haught were involved in Gilbert's investigation, they allege that their poor treatment, transfer, demotion, and discharge were retaliatory actions in response to Gilbert's investigation.

**Plaintiffs' FMLA Allegations**

Concurrent with her investigation into the billing discrepancies, Gilbert continued to fulfill her duties managing Dr. Hixenbaugh's office, which included managing employee FMLA leave (Doc. 9 at 44). Gilbert notes that her termination coincides not only with the culmination of her

4

investigation, but also with the date she reinstated Kirby following her FMLA leave (Doc. 9 at 12–13).

Kirby was granted FMLA leave in January 2011 due to pregnancy, and was reinstated to full-time employment with St. Rita's following the expiration of her leave on April 4, 2011 (Doc. 9 at 12). That day, which was also the day of Gilbert's termination, Kirby was greeted by Cotner, who informed Kirby and her grandmother-in-law Haught that they were being transferred (Doc. 9 at 13). Cotner refused to answer any questions regarding the transfer, and instead marched Kirby out of Dr. Hixenbaugh's office, through three other buildings, and into Dr. Vanan's office, where Kirby was re-assigned as a "file clerk." According to Kirby, this new position was a demotion from her former position as medical secretary (Doc. 9 at 13–14).

When Kirby returned to Dr. Hixenbaugh's office the next day to collect hers and Gilbert's belongings, Cotner informed her that the other employees were instructed not to communicate with her or Gilbert or their jobs would be in jeopardy (Doc. 9 at 14). Subsequent to these events, Kirby complained to St. Rita's through both the human resources department and the retaliation hotline (Doc. 9 at 14). Upon receiving Kirby's complaint via the hotline, Human Resources Manager Sandy Carver demanded that Kirby apologize for recording the events surrounding her transfer, or else face termination. When Kirby refused to apologize, she was fired (Doc. 9 at 14–15).

Kirby alleges her harassment, demotion, transfer, and discharge establish retaliation for use of protected FMLA leave (Doc. 9 at 6). Gilbert also alleges that her termination was motivated in part by her decision to reinstate Kirby, which she felt was required under the FMLA (Doc. 9 at 12). Unlike Gilbert and Kirby, Haught remained employed with Defendants for nine months following her transfer (Doc. 9 at 15). During this time, Haught alleges she was subjected to increased scrutiny and

5

a hostile working environment (Doc. 9 at 15–16). Specifically, Haught notes she was disciplined multiple times with little or no basis, and was frequently yelled or screamed at. After complaining about this behavior to no avail, Haught concluded Defendants were fabricating reasons to discipline her in an effort to pressure her to quit (Doc. 9 at 16). In December 2011, Haught resigned (Doc. 9 at 16).

## STANDARD OF REVIEW

Under Federal Civil Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While Rule 8 departs from the hyper-technical, code-pleading requirements, "it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–89 (2009). Therefore, under Rule 12(b)(6), this Court tests the legal sufficiency of the Complaint, which requires accepting all well-pleaded factual allegations as true and construing the Complaint in the light most favorable to Plaintiffs. *See Dubay v. Wells*, 506 F.3d 422, 426 (6th Cir. 2007). Although the Complaint need not contain "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the Complaint survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. And "[a] claim has facial plausibility when [Plaintiffs] plead[] factual content that allows the court to draw the reasonable inference that [Defendants are] liable for the misconduct alleged." *See Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

## ANALYSIS

**Plaintiffs' FCA Claims**

Plaintiffs allege Defendants violated the FCA by taking adverse employment actions against them in retaliation for Gilbert's investigation into Defendants' Medicare and Medicaid billing practices. Defendants do not challenge the merits of the FCA retaliation claims, but argue they are untimely because the applicable 180-day statute of limitations under R.C. § 4133.52 has expired (Doc. 12 at 3). While Plaintiffs agree that the Ohio whistleblower statute provides the applicable limitations period in this case, they contend their FCA claims relate back to the original complaint because they arise out of the same transaction and occurrence as their original claims (Doc. 14 at 1–3).

In asserting that Ohio law provides the applicable limitations period for FCA retaliation, both parties rely on *Graham County Soil & Water Cons. Dist. v. United States*, 545 U.S. 409 (2005), where the Supreme Court held retaliation claims under 21 U.S.C. § 3730(h) were not subject to the FCA's six-year statute of limitations. As the parties note, *Graham* directed courts to "borrow" the statute of limitations governing the most analogous state statute, which in this case would be R.C. § 4133.52. *Graham*, 545 U.S. at 417–18. However, five years after *Graham*, Congress enacted the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010, which expressly amended the FCA to supply a statute of limitations for retaliation claims. That provision, effective July 2010, provides that "[a] civil action under [the FCA's anti-retaliation provisions] may not be brought more than 3 years after the date when the retaliation occurred." 31 U.S.C. § 3730(h)(3). Therefore, the appropriate limitations statute governing this case, and the one this Court applies, is 31 U.S.C. § 3730(h)(3). The retaliation claims, filed within the three-year limitations period, are timely.

7

**The FMLA Claims**

In addition to their FCA allegations, Plaintiffs allege Defendants retaliated against them for protected activity under the FMLA, which makes it unlawful for an employer to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a)(2). Essentially, the FMLA directs employers that they may not "'use the taking of FMLA leave as a negative factor in employment actions.'" *Arban v. West Pub. Corp.*, 345 F.3d 390, 403 (6th Cir. 2003). To establish a prima facie case of retaliation under the FMLA, Plaintiffs must show: (1) they were engaged in activity protected by the FMLA; (2) Defendants knew they were exercising rights under the FMLA; (3) Defendants thereafter took an employment action adverse to Plaintiffs; and (4) a causal connection exists between the protected FMLA activity and the adverse employment action. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (citing *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir.2006)).

### *Kirby's FMLA Claim*

Whether each Plaintiff can succeed with her own prima facie case is not a question for this Court at this juncture. Rather, this Court must accept all pleaded allegations as true and test the legal sufficiency of the Complaint. *See Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003). In doing so, it is clear Kirby alleged sufficient facts to support her retaliation claim under the FMLA. The Complaint alleges Kirby took protected FMLA leave, and Defendants concede Kirby worked the requisite number of hours to be eligible for the FMLA (Doc. 18 at 1). Kirby further alleges that upon learning of her reinstatement, Defendants took an adverse employment action by demoting, transferring, and discharging Kirby. Moreover, the Complaint alleges the temporal proximity between Kirby's reinstatement and her discharge (Doc. 9 at 21).

8

### *Gilbert's FMLA Claim*

Whether Gilbert has alleged sufficient facts to support an FMLA claim in her own right presents a more difficult question. It is undisputed that Gilbert did not take protected FMLA leave, nor was she prevented from doing so. Instead, Gilbert alleges she was engaged in "protected activity" by opposing a practice made unlawful by the FMLA. Specifically, Gilbert alleges she reinstated Kirby to full-time employment after her leave expired because not doing so would violate the FMLA.

Gilbert directs this Court to the case of *Wood v. Handy & Harman Co.*, 2006 WL 3228710 (N.D. Okla. 2006). In *Wood*, the plaintiff was fired for refusing to deliver a memo he felt inappropriately challenged an employee's FMLA rights. Although the plaintiff did not avail himself of FMLA rights, the court held he set forth a prima facie case of retaliation because he believed the memo was a violation of the FMLA. *Id.* at *4 ("Wood can also demonstrate he engaged in protected activity if he reasonably believed [the memo] violated [someone's] FMLA rights."). Gilbert contends that her reinstatement of Kirby is just like the *Wood* delivery refusal. Not so.

In *Wood*, the plaintiff actually knew the employer's position regarding an employee's FMLA rights, believed that position was unlawful, and opposed it. Here, Gilbert reinstated Kirby with no interference from Defendants (Doc. 18 at 2). Gilbert had no policy directive opposing Kirby's reinstatement from FMLA leave (Doc. 18 at 1). Construing all factual allegations in the light most favorable to Plaintiffs, this Court is unable to draw the reasonable inference that Defendants are "liable for the misconduct alleged." *Hensley Mfg.*, 579 F.3d at 609.

### *Haught's FMLA Claim*

Although Haught alleges she was constructively discharged after enduring nine months of harassment following Kirby's return from medical leave, the Complaint fails to allege that she availed

9

herself of a right protected by the FMLA or that she opposed an unlawful practice under the FMLA. Nevertheless, Plaintiffs ask this Court to do what no other court has done -- expand the scope of the FMLA to include retaliation claims from persons who merely associate themselves with an employee that availed herself of the FMLA. As support, Plaintiffs cite the Supreme Court's recent decision in *Thompson v. North American Stainless, LP*, 131 S. Ct. 863 (2011), which held Title VII's anti-retaliation provision is broad enough to include third-party retaliation claims. According to Plaintiffs, the Supreme Court's logic in *Thompson* should also apply to the FMLA.

While no federal circuit court has addressed the issue, this Court finds Plaintiffs' argument unpersuasive. Although it is true that the FMLA often borrows from Title VII jurisprudence, there are limitations. Prior to *Thompson*, authorities were split as to whether a third party could bring a claim of retaliation motivated by the protected activity of another employee. The split divided courts into two camps: those following the "plain meaning" of the statute, and those following the "purpose" of the statute. *Compare e.g.*, *Fogleman v. Mercy Hosp. Inc.,* 283 F.3d 561 (3d Cir. 2002) (plain-meaning) *with Morgan v. Napolitano,* 2010 WL 3749260 (E.D. Cal. 2010) (purpose).

Courts focused on the plain meaning of Title VII generally held that only those individuals who actually engaged in protected activity could bring an action for retaliation. *See e.g., Holt v. JTM Industries, Inc.*, 89 F.3d 1224 (5th Cir. 1996); *Paynter v. Licking Memorial Health Systems*, 2007 WL 2874804 (S.D. Ohio). Other courts focused on the purpose of the statute, recognizing that Title VII, as with other retaliation statutes, was enacted to protect employees from employer decisions that would chill the reporting of discrimination or the availment of protected rights. *See e.g.*, *Napolitano,* 2010 WL 3749260 at \*7; *Holt,* 89 F.3d at 1231 (Dennis, J. dissenting). These courts further recognized that allowing employers to retaliate against an employee's associates would effectively

10

destroy any protections provided and, perhaps, encourage employers to harm more employees. Accordingly, even if the plain meaning did not accommodate third-party claims, these courts held the legislature intended to provide such protection.

In *Thompson*, the Supreme Court seemingly resolved this split, holding the statutory *language* of Title VII allowed third-party retaliation claims, at least within the "zone of interests." *Thompson*, 131 S. Ct. at 869–70. In short verse, the Supreme Court observed that Title VII's anti-retaliation provision is broader than the statute's substantive anti-discrimination provisions. The Court rested its holding specifically on the broad "person . . . aggrieved" language of Title VII, language that is notably absent from the FMLA. In contrast to Title VII, the FMLA delineates certain specific classes of individuals who may bring an action -- those who have been denied a right protected by the Act ("interference" plaintiffs) and those who opposed an employer's unlawful action under the Act ("retaliation" plaintiffs). *See Donald*, 667 F.3d at 761. This, of course, reflects the narrower reach of the FMLA.

Moreover, it stands to reason that Congress's intentional omission of Title VII's broad language in the FMLA specifically prohibits Plaintiffs' interpretative extension of *Thompson*. Indeed, courts "must be attentive to the way [discrimination and retaliation] statutes differ in their language, their purposes, and their scope of protection." *Smith v. BellSouth Telecomm., Inc.*, 273 F.3d 1303, 1310 (2001). For that reason, some jurisdictions have recognized that in contrast to the counterpart provisions of other employment statutes, "the language of the FMLA is markedly narrower." *Elsensohn v. Parish of St. Tammany*, 2007 WL 1799684 (E.D. La. 2007); *see also Paynter v. Licking Memorial Health Sys.*, 2007 WL 2874804 (S.D. Ohio 2007).

Given the difference in statutory text between the FMLA and Title VII, as well as *Thompson*'s specific focus on language excluded from the FMLA, this Court finds the FMLA does not allow for

11

causes of action under a third-party theory. Accordingly, Haught's FMLA claim cannot survive Defendants' Motion. To the extent Gilbert also seeks to assert third-party standing under the FMLA, her claim also fails.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted in part. Count II of the First Amended Complaint is dismissed with respect to Plaintiffs Gilbert and Haught for failure to state a claim for which relief can be granted, and Count I remains in its entirety.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

June 20, 2012